UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARLENE SIMPSON

    Plaintiff,

  v.

ST. JAMES HOSPITAL,

    Defendant.

No. 13 CV 5857

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Arlene Simpson worked as a registered nurse at defendant St. James Hospital until she was terminated, ostensibly for her two-year pattern of rude and otherwise inappropriate behavior. In this action, however, plaintiff claims the real reason she was fired is that she was female, African American, over 40, or pregnant. Plaintiff's four-count complaint alleges violations of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Americans with Disabilities Act. Defendant has moved for summary judgment on all counts. For the following reasons, defendant's motion is granted.

**I.    Legal Standard**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background

Plaintiff Arlene Simpson, an African-American woman, began working as a registered nurse at defendant St. James Hospital in 2008. Assigned to an orthopedic surgery floor called "3 South," plaintiff's duties included caring for patients, taking vital signs, reporting patients' conditions to doctors, and helping with admission and discharge.

In late 2009, Maureen Kelly, a Caucasian woman, became the patient care manager on 3 South and thus plaintiff's supervisor.[1] Although plaintiff regularly received high performance review scores from the manager she had before Kelly, plaintiff's scores dropped off substantially once Kelly took over. And for the first time, plaintiff began receiving formal reprimands for allegedly violating hospital rules. These citations were documented on forms called "Employee Corrective Action Reports," in which Kelly would describe the underlying conduct, identify the rule plaintiff violated, indicate the punishment (if any), and call for plaintiff's signature. Plaintiff denies that any of the reprimands—or her eventual termination—were justified. A summary of the reports follows below.

---

[1] Plaintiff also reported to two "charge nurses," Glen Rach (a Caucasian male) and Vanessa Mendez (a Caucasian female).

On October 14, 2010, plaintiff received an "oral reminder" after a doctor complained that plaintiff failed to follow his orders to discontinue a patient's morphine pump and change the patient's surgical dressing.

On January 14, 2011, plaintiff received a "written reminder" in which Kelly said plaintiff directed a patient care technician to help with two medical procedures which were beyond the technician's scope of care. Plaintiff was also alleged to have noted the process and result of one of the procedures in the patient's file, even though plaintiff did not actually participate in it.

On July 28, 2011, plaintiff received a "written reminder" from Kelly based on three "patient care concerns" all occurring that same month. On July 9, 2011, the Employee Corrective Action Report alleged, a patient's daughter told the charge nurse that plaintiff's perfume was so strong it made the patient sick. When plaintiff heard of this complaint, she confronted the patient and denied she was the one who had been wearing perfume in the patient's presence. When the patient insisted it was her, plaintiff responded, "Great, now I will have to get the first patient"—i.e., the next patient to enter the hospital. Kelly testified that she was out of town when this incident occurred, but that she investigated and confirmed it when she returned.

On July 13, 2011, a patient's fiancé complained that the room was dirty, a bedpan had been emptied into the toilet but not flushed, and a garbage can was attracting flies at the foot of the patient's bed near her surgical wound. The fiancé also reported that the patient needed a sponge bath and that—when he suggested

as much to plaintiff—she rudely responded that she was doing her job so long as the patient was washed by the end of her shift. A patient care representative followed up on this complaint and then relayed the information to Kelly.

The last incident recorded in the July 28th "written reminder" occurred on July 20, 2011, when plaintiff allegedly failed to connect suction for a patient's nasogastric tube as ordered by a doctor. The patient's family also allegedly complained that plaintiff came off as though their requests bothered her. They asked for a different nurse to be assigned.

Finally, on September 26, 2011, one final Employee Corrective Action Report was prepared for plaintiff and it served as her notice of termination. When a patient complained to others about plaintiff failing to bring her ice, plaintiff confronted the patient, denied she ever asked plaintiff for ice, and remarked that plaintiff "did not need any bad marks against her." Plaintiff then proceeded to remove the patient's morphine pump, which Kelly construed as retaliation. Kelly investigated the complaint and—citing the events documented in the reports dated October 14, 2010, January 14, 2011, and July 28, 2011—terminated plaintiff.

After unsuccessfully appealing her termination, plaintiff filed the present action in which she alleges four types of employment discrimination. In Count I, plaintiff claims she was written up and terminated as a result of being over 40 years old, in violation of the Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.*). In Counts II and III, plaintiff claims she was written up and terminated because she is African American and female, in violation of Title VII of

4

the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2 *et seq*.). Finally, in Count IV, plaintiff claims Kelly wrote her up and terminated her due to plaintiff's pregnancy,[2] in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq*.). Defendant has moved for summary judgment on all counts.

## III. Analysis

Because plaintiff has no direct evidence of discrimination, she seeks to maintain her four claims under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this method, a plaintiff establishes a *prima facie* case of sex-, age-, race-, or disability-based discrimination if she demonstrates, by a preponderance of the evidence, that: (1) she is a member of these protected classes; (2) at the time of termination, she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who were not part of the protected classes. *See Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 326 (7th Cir. 2002); *Patton v. Indianapolis Public School Bd.*, 276 F.3d 34, 338 (7th Cir. 2002); *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). Once the plaintiff establishes a *prima facie* case of discrimination, the employer, to avoid liability, must produce a legitimate, nondiscriminatory

---

[2] Simpson believes she was about six months pregnant at the end of her employment, and thinks she told Kelly about the pregnancy when she was two and a half to four months pregnant. Kelly instructed plaintiff to obtain a doctor's note so there would be something on file saying what her restrictions were. Plaintiff never ultimately requested any accommodations for her pregnancy because she remained physically able to perform her job until the time of her termination.

5

reason for the employee's termination. *Peele*, 288 F.3d at 326. If the employer is able to do this, the burden shifts back to the plaintiff to rebut the explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual. *Id*. Pretext means a dishonest explanation; a lie rather than an oddity or an error. *Id*. A plaintiff does not reach the pretext stage, however, unless she first establishes a *prima facie* case of discrimination. *Id*.

### A. Plaintiff has established a *prima facie* case of discrimination on Counts I and II, but failed to establish a *prima facie* case on Counts III and IV.

Plaintiff attempts to satisfy the first element of her *prima facie* case—that she met defendant's legitimate expectations—with evidence that she was never disciplined, and received only favorable reviews, before Kelly became her supervisor. This evidence is not probative, however, because "the issue is not the employee's past performance but whether the employee was performing well at the time of her termination." *Peele*, 288 F.3d at 329 (quotation omitted). "Furthermore, prior job performance evaluations, standing alone, do not create a genuine issue of triable fact when there have been substantial alterations in the employee's responsibilities and supervision in the intervening period." *Id*. (quotation omitted).

Plaintiff offers no other evidence on the first element but argues instead that she can establish a *prima facie* case of discrimination by showing defendant applied its expectations in a discriminatory manner. "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated

6

[male, younger, non-African-American, or non-disabled] employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele*, 288 F.3d at 329.

Plaintiff identifies four nurses who allegedly violated the same rules as her but who were not disciplined or terminated as she was: Nancy Galderia, Erica Martin, Robyn Williams, and Vanessa Mendez. Plaintiff does not identify any comparators who are male or expressly non-disabled. She therefore has no support for the inference that defendant applied its rules against her more strictly due to her gender or pregnancy. As a result, there is no genuine issue of material fact on Counts III and IV, and defendant's motion is granted as to those counts.

The evidence on Galderia and Martin suffices to support the inference that defendant applied its rules disparately. Galderia (a Caucasian woman) was also involved in the July 13, 2011 incident, in which a patient's fiancé complained that both plaintiff and Galderia were rude. Although defendant correctly notes that plaintiff alone is alleged to have returned to confront the fiancé, Galderia was not punished at all for her rudeness, which on its own violated the hospital's written policy prohibiting "[r]ude or discourteous behavior to co-workers, patients, physicians or anyone else at St. James Hospital and Health Centers." At the same time, rudeness underlay the Employee Corrective Action Report plaintiff received in relation to the events of July 9, 2011, and was specifically noted with regard to the

7

incident on July 13, 2011. If defendant applied its rules evenly, it would have cited Galderia for the infraction.

Likewise, both plaintiff and Felicia Carter swore under oath that Erica Martin, who was Caucasian and under 40, once received complaints from "an entire team of patients" (i.e., five to six patients) on one day, yet Martin was not disciplined at all. Defendant attempts to counter this by saying it has no record of such an incident, but that is wholly consistent with the theory that Martin was subjected to more lenient rules.

Accordingly, plaintiff's race and age claims proceed to the pretext inquiry.

**B. Plaintiff has not presented evidence sufficient to enable a trier of fact to find that defendant's proffered explanations are pretextual.**

Since plaintiff has produced evidence sufficient to raise an inference that defendant applied its legitimate employment expectations in a disparate manner, plaintiff must now show that defendant's proffered reasons for terminating her—the events cited in the September 26, 2011 Employee Corrective Action Report—were merely pretextual. Defendant bears the burden at summary judgment to demonstrate its entitlement to judgment as a matter of law, but plaintiff must come forward with some evidence that would allow the trier of fact to conclude that defendant's reasons were lies. *See Novak v. Board of Trustees of Southern Illinois University*, 777 F.3d 966, 974 (7th Cir. 2015); *Bojda v. Black Dot Graphics, Inc.*, 12 F.3d 1100 at *1 (7th Cir. 1994) (table).

The first basis for termination was the "Oral Reminder for Work Performance on October 16, 2010," in which a doctor complained that plaintiff failed to follow

orders to discontinue a morphine pump and change the patient's surgical dressing. Plaintiff argues that she followed "standard hospital procedure when leaving the dressing on and PCA pump connected," and she refers vaguely to "other nurses [who] performed the same actions, but were not disciplined." The "standard hospital procedure" to which plaintiff refers is the hospital's policy of "accommodat[ing] patients and their requests, especially if [the requests are] related to making the patient feel more comfortable, so long as doing so d[oes] not endanger the patient's health." But, be that as it may, the reason Kelly gave plaintiff for issuing the oral warning was that the doctor who issued the order was upset and wanted the nurse responsible to be reprimanded. Plaintiff appears not to have tried to confirm or contradict this story by deposing this doctor, nor has she presented other evidence showing that the doctor was not the true motivating reason. At the same time, plaintiff does not deny that she failed to remove the pump and change the dressing in the morning as the order required. Accordingly, no factfinder could see pretext in this instance.

The next basis for termination was the "Written Reminder for Work Performance on January 14, 2011." Plaintiff allegedly ordered a patient care technician to (1) assist a physician with a thoracentesis procedure, and (2) "set up suction in a room for another patient." Both of these tasks were beyond the technician's scope of practice. Plaintiff is also alleged to have made records in one of these patient's charts concerning a procedure she was not present for. While plaintiff denies ordering the technician to perform either of these tasks, such a

9

denial is not enough to show pretext in this case. A plaintiff can show pretext by, among other things, demonstrating that an articulated reason for an adverse action had no basis in fact. *See Davis v. Con-way Tranp. Central Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). But plaintiff admitted in her deposition that a technician was present for the thoracentesis procedure, she acknowledged she asked a technician to obtain the suction equipment (though not to set it up), and she offers no evidence contradicting the claim that she inappropriately made entries in the patient's chart. Thus, even if Kelly had it wrong in thinking plaintiff directed the technicians as claimed, Kelly's belief was not so baseless as to suggest pretext. Finally, although plaintiff is free to contradict her prior unsworn statements at summary judgment, her signed response to the Employee Corrective Action Report specifically stated that plaintiff "asked the PCT [patient care technician] (Angela) if she could assist Dr. Kemp by turning [the] patient over to her side." It also stated that plaintiff "felt comfortable with [this] decision." Plaintiff does not attempt to explain the contradiction between this statement and her position in litigation.

The third reason for plaintiff's termination was the "Written Reminder for Behavior on July 28, 2011," which involved three separate incidents all occurring that same month. Plaintiff attacks this basis by pointing to defendant's policy of notifying employees immediately about any performance issues. Plaintiff says defendant failed to follow its own policy when it did not address the events of July 9, 13, or 20, until July 28th. However, as defendant correctly points out, the

10

undisputed evidence shows that plaintiff was actually notified right after each incident. *See* [45] at 13; [46] ¶ 28.

Plaintiff also argues that none of her alleged behavior in any of these July incidents truly violated defendant's rules. That is not the question, though. *See Balance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005) ("[Courts] do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation."). Defendant has set forth undisputed evidence showing that, in each of the three instances, Kelly learned of complaints made against plaintiff consisting of conduct that violated the rules. This information served as the non-discriminatory basis of Kelly's decision to reprimand plaintiff. Plaintiff presents no evidence showing that Kelly knew these complaints were false or that Kelly's reliance on these complaints (true or false) was otherwise pretext.

The final basis for plaintiff's termination were the events of September 21, 2011, in which plaintiff allegedly confronted a patient and discontinued her use of a morphine pump as retaliation. Plaintiff seeks to undermine this basis by asserting that Kelly failed to check whether plaintiff was simply following the doctor's order to discontinue the morphine pump. This fact alone, however, is insufficient to enable a trier of fact to find that defendant's explanation is pretextual. At most, Kelly's failure to check suggests "an oddity or an error"—not a lie. What is more, plaintiff fails to address the charge that she confronted the patient, which Kelly confirmed by interviewing the patient and "all the parties involved."

In sum, a trier of fact could not find that defendant's proffered explanations were pretextual. Summary judgment is therefore granted in favor of defendant on Counts I and II.

**IV.  Conclusion**

Defendant's motion for summary judgment [27] is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  7/8/15